## SADLER ET AL. ADM. VS. SADLER.

The plaintiffs suing as administrators, having proved by the record of the Probate Court, upon an issue to the plea of *ne unques administrators*, that letters of administration upon the estate of their intestate, had been granted to the defendant, and afterwards revoked; and that administration was then granted to them — the reading, by the defendant, of the letters granted to him, was not prejudicial to the plaintiffs.

In such case, the letters of administration granted to the plaintiffs, were *prima facie* evidence of their authority to sue: and although an instruction, that the plaintiffs could not recover unless they are *bona fide* administrators, would be objectionable; yet there was no substantial error in such instruction, the court having also instructed the jury that if they believe the letters of the defendant were revoked, and that letters were granted to the plaintiffs, they are, in fact, the administrators.

Hearsay statements are clearly inadmissible as evidence; and the court should promptly exclude from the jury any incompetent matter which might tend to influence their conclusion.

A witness, in the course of his examination, after some unobjectionable testimony, makes a statement upon hearsay; the party against whom he is called objects to the "above statement;" and, upon his objection being overruled, excepts; the witness then proceeds with his testimony: HELD, That it is sufficiently manifest that the objection was made to the hearsay testimony.

Where the court refuses to give an instruction in the words of the party asking it; but in lieu thereof, gives one more favorable to him, he has no cause to complain: nor where the court refuses to give instructions, unexceptionable in themselves, if the substance of them be given in other instructions—the multiplication of instructions disapproved.

It is error in the court to give an instruction not warranted by the testimony, and which may mislead the jury.

The power of the Legislature to pass laws limiting the time in which actions shall be brought, and controversies about the title to property shall be at repose, so that all existing remedies be not cut off, *eo instanti*, is now too well established to admit of question.

It is beyond question, that the possession of a slave for a period of some thirteen years— the possessor of the slave during all that time, claiming and controlling him as his

own property, and not obtaining possession under any instrument of writing—by virtue of the statute, (*Digest, chap.* 153, *secs.* 3, 4, 5,) vests in the possessor a perfect legal title to the slave, which he may rely upon as a bar to an action against him for the slave, or which he may assert, if the slave be deforced from him, in a suit for his recovery.

An instruction that "when the admissions of a party are introduced in evidence, all he said in the same conversation is evidence before the jury, as well what he said in his own favor as against him," should be qualified by the further instruction that the jury should compare its consistency with the other testimony in the cause, and so form their opinion of the weight to be attached to it.

*Appeal from Yell Circuit Court.*

Hon. WM. H. FEILD, Circuit Judge.

S. H. HEMPSTEAD, for the appellants. In this case, the deceased having had peaceable possession of the slave for five years from the 19th of December, 1846, and there being no writing acknowledged and recorded, his title was perfect; and, therefore, there should be a new trial.

JORDAN, for the appellee. It was purely a question of fact for the jury to find, whether plaintiff's intestate had held peaceable possession of the boy five years before the commencement of this suit, as his property, or under color of title; or, whether, during the time he had held possession, they might presume a sale, or whether he held him by a loan, or otherwise, and prior to his death had surrendered possession of the boy to defendant, as his property.

· From the fact that defendant had possession of the boy some three months, prior to Lucien's death, claiming him as his own, and that defendant sent for him to attend on his brother in his last sickness; the jury not only had the right to infer he belonged to defendant, but it was the only legitimate conclusion, from the facts before them.

Some portions of the testimony of A. S. Heck, defendant's witness, were objected to on the trial, and overruled. A part of the

testimony so objected to, was *relevant*, and the motion failed to point out and distinguish between the relevant and irrelevant, and, of course, was properly overruled.   *Gracie vs. Robinson,* 14 *Ark. Rep.*

The instruction given by the court in lieu of the 3d, asked by plaintiffs, was more favorable to their cause of action; and, therefore, no ground of error.   The substance of the 8th and 9th was embraced in the 5th and 6th; and, consequently, properly refused.

The 11th instruction asked by the plaintiffs, was not supported by the evidence, and properly refused, there being no evidence that deceased held the slave by virtue of any deed or instrument of writing.

The 1st and 2d instructions given, on motion of defendant, when taken in connection with the instructions given for the plaintiffs, are clearly applicable to the case.

That the 3rd is correct, the following authorities are submitted: *Adkins vs. Hershy,* 14 *Ark.* 442; 1 *Greenl. Ev., sec.* 201, 152; *and note, on page* 305 ; 4 *Term R.* 669; 2 *Stark.* 34; 1 *Phil.* 34, 357, *note* 1.

The plaintiffs having had the full benefit of the law upon the trial, through the medium of instructions, and the jury having found the facts against them, this court will not disturb the verdict, unless there is a total failure of evidence to support it. *Turner vs. Higgins,* 14 *Ark. Rep.* 21; *Brown vs. Cook,* 14 *Ark. Rep.* 202; *Floyd et al. vs. Ricks.* 14 *Ark. Rep.* 297; *Miller vs. Ratliff,* 14 *Ark. Rep.* 419; *Drennen vs. Brown,* 5 *Eng.* 140 ; *Sparks vs. Beavers,* 6 *Eng.* 680 ; *State Bank vs. Conway,* 18 *Ark.* 344.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

On the first day of February, 1854, Wilhelmina L. Sadler, administratrix, and John W. May, administrator of Lucien O. Sadler, deceased, brought an action of replevin, in the Yell Circuit Court, against Theodore P. Sadler, for the recovery of a slave named Ben.   The declaration contained two counts; one in the *cepit* and the other in the *detinet.*

The defendant pleaded, 1st. *Ne unques* administrators: 2d. *Non cepit:* 3d. *Non detinet:* 4th. Property in the defendant as administrator of the said Lucien O. Sadler : and 5th. Property in the defendant in his own right, and not in the plaintiffs as administrators, &c. Issues were made up upon these pleas, trial, verdict for the defendant, motion for a new trial overruled, and a bill of exception taken.

So much of the evidence, and instructions of the court to the jury, as relates to the issue upon the plea of *ne unques administrators,* will be considered first.

It appears from the bill of exceptions that the plaintiffs read in evidence letters of administration granted to them by the Probate Court of Johnson county, upon the estate of Lucien O. Sadler, deceased, bearing date 27th January, 1854.

They then introduced a transcript from the record of said Probate Court, showing that on the 6th day of January, 1854, letters of administration upon the estate of Lucien O. Sadler, deceased, were granted by the clerk of the court in vacation, to John J. Walker, the widow of Sadler (Welhelmina L.) waiving her right to administer, and his children being infants. That at the next succeeding term of said Probate Court, on the 25th of January, 1854, on the petition of the defendant, Theodore P. Sadler, representing himself to be a creditor of Lucien O. Sadler, deceased, and that Walker was neither a creditor, nor a distributee of said estate, the letters granted by the clerk, in vacation to Walker, were revoked by the court, and letters granted to the defendant. That on the 27th of January, 1854, on the petition of the plaintiffs, the letters granted to the defendant were revoked by the court, and letters granted to the plaintiffs. No appeal appears to have been taken from this last order of the court.

After the plaintiffs had closed their testimony in the cause, the court permitted the defendant, against the objection of the plaintiffs, to read in evidence the letters of administration granted to him upon the estate of Lucien O. Sadler, by the Probate Court of Johnson county, and the plaintiffs excepted.

On this branch of the case, the court instructed the jury, at the instance of the plaintiffs, as follows:

(7.) "That the letters of administration produced here by the plaintiffs, are evidence to prove the fact of the plaintiffs' representative capacity.

"(10.) That if they believe, from the evidence, that the defendant was appointed administrator by the Probate Court of Johnson county, and that afterwards, at the same term of said court, his letters so granted were revoked, and that during the same term of said court, letters of administration were granted to the plaintiffs, the plaintiffs are in fact the administratrix and administrator of the said Lucien O. Sadler, deceased."

On the motion of the defendant, the court instructed the jury as follows:

"(1.) That the plaintiffs cannot recover in this action unless they were *bona fide* administrator and administratrix of the estate of Lucien O. Sadler, deceased, at the commencement of this suit, as in their declaration alleged."

To the giving of which the plaintiffs excepted.

The decision of the court permitting the defendant to read in evidence the letters of administration granted to him by the Probate Court of Johnson county, upon the estate of Lucien O. Sadler, could hardly have been prejudicial to the cause of the plaintiffs, because the transcript from the record of the Probate Court, which they had previously read in evidence to the jury, embraced a copy of the same letters. Moreover, the court charged the jury in effect, by the instruction copied above, numbered (10), given at the instance of the plaintiffs, that the letters granted to the defendant having been revoked by the Probate Court during the same term at which they were granted to him; and, thereupon, letters granted to the plaintiffs, they were in fact the administrators of the deceased.

The instruction copied above, numbered (1,) and given at the instance of the defendant, was unobjectionable, if the words *"bona fide"* had been omitted. The issue was whether the plaintiffs were

the legal administrators of Sadler, and not whether they were such in *good faith*. The jury under this issue, had nothing to do with their good or bad faith in becoming the administrators of Sadler, or in acting as such. The letters of administration introduced by the plaintiffs, were *prima facie* evidence of their authority to sue. The defendant failing to show that the letters were forged, that the Probate Court had no jurisdiction and power to grant them, or that, from some other legal cause, they were null and void, there was but little or nothing under the issue of *ne unques adminis- trators* for the jury to pass upon. Whether the Probate Court had granted the letters to the right or wrong person, or had acted irregularly in revoking the letters of the defendant, and granting letters to the plaintiffs, were not questions for the jury to deter- mine. Such questions could only properly arise on a direct pro- ceeding to review the action of the Probate Court in the matter. See 2 *Greenl. Ev.*, *secs.* 339, 340.

But taking all the instructions given by the court to the jury on this branch of the case together, there is no substantial error: none that could have mislead the jury.

On the other branch of the case, the evidence and action of the court were as follows :

John Cravens, witness for the plaintiff, testified, that Lucien O. Sadler, deceased, had been in the possession of, and exercised acts of ownership over, the slave Ben for some ten, twelve or fourteen years prior to his death. That Ben was in his posses- sion at the time of his death. Witness had lived within a mile of Lucien O. ever since Ben became his property, and had never heard of one setting up any claim to the negro prior to the death of Lucien O. The defendant lived in Yell county, some fifteen or twenty miles from Lucien O. during all the time he had pos- session of Ben.

Nehemiah Cravens, witness for plaintiffs, testified that the slave in controversy, Ben, was in possession of Lucien O. Sadler from the year 1839 or 1840, until his death. That he exercised acts of ownership over him, and he was regarded as his property.

41ʙ

Witness had never heard of any one setting up any claim to the negro prior to the death of Lucien O. Witness knew the negro when he belonged to Logan. That Logan or Clark sold him to the defendant about the year 1836, who had possession of him for three or four years prior to 1839 or 1840, and then the negro came into the possion of Lucien O. and so remained until his death, as far as witness knew. Witness saw the negro waiting on him in his last illness.

Thomas Haines, witness for plaintiffs, testified that he had known the negro Ben some seven or eight years. He was in possession of Lucien O. the first time he ever saw him, which was seven or eight years before the death of Lucien O. Witness worked for him frequently, and the negro was always in his possession, and he exercised acts of ownership over and controlled Ben as he did his other negroes. Never heard of any one else having any right or claim to the negro from the time witness first became acquainted with him until after the death of Lucien O. Witness was present when the writ of replevin was served upon the defendant, and saw the negro upon the premises working on the defendant's farm.

John Haines, (by whom introduced does not appear) testified that Lucien O. held possession of the negro five or six years; did not know that he remained in his possession all the time up to his death. Witness saw the boy in possession of the defendant some two or three months before the death of Lucien O. That he was working for the defendant, on his plantation, and remained in possession of the defendant until a few days before the death of Lucien O. That the defendant went over to see Lucien in his last sickness, and while there sent for the boy Ben to come and wait upon his brother, Lucien, in his last illness. Witness lent defendant his horse to convey the negro over to Lucien's, and he remained there and waited on Lucien until after his death. It was a negro boy of Lucien's that came after Ben. The boy said master Preston (Theodore P.) sent him after Ben, and that his master Preston requested witness to loan him his horse

for Ben to ride over; which witness did, and Ben rode off his horse. · That some three or four weeks before Ben was replevied, witness saw him on the farm of defendant laboring for him. That while Ben was in possession of defendant, at his residence, Ben passed by the door, and Mr. Duncan asked defendant whose negro that was? Defendant said it belonged to him, and always had belonged to him—witness did not recollect whether this conversation took place while Ben was in possession of defendant before the death of Lucien O. or after. Defendant is sometimes called Preston, and sometimes Theodore.

A. S. Heck, witness for defendant, proved the signature of L. N. Clark to the endorsement upon a bill of sale shown to him, and to which he was a subscribing witness. He then stated that he knew the boy Ben before Lucien O. got possession of him. That defendant purchased the negro from Jonathan Logan or Clark, and held possession of him until about 1839 or 1840. That defendant's wife died about that time, and after her death, he broke up house-keeping, and Ben and three others of his negroes went to Lucien O. Sadler's, where they all remained about five or six years. That Jonathan Logan told witness that defendant sold all but Ben. To this statement of the witness—the above statement, a sit is termed in the bill of exceptions—the plaintiffs objected, but the court overruled the objection, and permitted it to go to the jury as evidence, and plaintiffs excepted.

The statement of this witness as to what Jonathan Logan told him about the defendant's selling all the negroes but Ben, was clearly incompetent, and should have been excluded from the jury, as evidence by the court. It being now the settled law in this State, that the verdict of the jury is conclusive upon the facts submitted to them, unless their finding is clearly not sustained by the evidence, the court should promptly exclude from them any incompetent matter, which might tend to influence their conclusion, and more especially where the testimony is in conflict, and slight circumstances might turn the scale one way or the other.

It is urged by the counsel for the defendant, that the motion to exclude was not sufficiently explicit in pointing out the particular portion of Heck's testimony that was deemed objectionable by the plaintiffs. The bill of exceptions might have been more explicit, but we think it sufficiently manifest that the objection was intended to apply to what the witness was permitted to state that Logan had told him about the defendant selling all the negroes but Ben. There was nothing in the testimony of Heck, previous to this, that could have been objectionable, and in the bill of exceptions, the objection and exception immediately follow this statement, and then the remainder of Heck's testimony is stated.

Heck further testified, that in the year 1832 or 1833, and for two or three years, the defendant and Lucien O. were in partnership in a farm, stock and property, as he understood. That they held themselves out to the world as partners at that time— to this statement, the plaintiffs also objected, but the court overruled the objection and they excepted.

He further testified, that the defendant left Johnson county, where he and Lucien O. were said to be in partnership, in the year 1835 or 1836, and witness had never understood them to be in partnership since that time. That Ben did not go to Lucien's to live until some years after the defendant moved to Yell county. Witness did not know whether they dissolved partnership or not. He had never heard them called partners since the defendant moved to Yell county to live in 1835 or 1836.

It does not appear from the bill of exceptions, or the argument of counsel, what object the defendant had in view, in proving a partnership between himself and his brother Lucien. It may be supposed that it was designed to conduce to show a joint ownership and joint possession of the negro Ben. But it seems, from the statement of the witness, that the partnership ceased about the year 1836, which was several years prior to the time that the boy Ben went into the possession of Lucien. So that, whether this testimony was relevant to the issue or not, it is not perceived that

the admission of it by the court could have been of any prejudice to the plaintiffs.

The court next permitted the defendant to read to the jury, against the objection of the plaintiffs, a bill of sale made by Jonathan Logan, conveying to Lorenzo N. Clark "a negro man slave, about twenty-five years old," &c., bearing date 12th February, 1836, together with an endorsement thereon, made by Clark, transferring the bill of sale to the defendant, dated 17th February, 1836.

The plaintiffs objected to the introduction of the bill of sale and assignment, because no negro was named or identified therein, and no evidence offered in connection therewith to show that Ben was the negro conveyed thereby.

The witnesses, both for the plaintiffs and the defendant, had proven that the defendant purchased the boy Ben from Logan or Clark about the year 1836, kept him in his possession some three years, and then delivered him to Lucien O. Sadler. Even if this testimony was not sufficient to lay a foundation for the introduction of the bill of sale and assignment, their admission could not have been prejudicial to the plaintiffs, because they only conduced to prove a fact which the plaintiffs themselves had already proven.

It appears that Lucien O. Sadler died in Johnson county, in December, 1853. The above is all the evidence introduced by the parties. The instructions of the court to the jury, are as follows:

At the instance of the plaintiffs:

1. "That no bill of sale or other instrument of writing is necessary to transfer property in a slave—the title of slaves pass by sale and delivery. (*Given.*)

2. "Five years peaceable possession of slaves after 19th December, 1846, is sufficient to give the possessor a right of property against all persons. (*Given.*)

3. "That if the jury believe, from the evidence, that Lucien O. Sadler, deceased, had five years adverse peaceable possession of the

slaves mentioned in the declaration, it gave his administratrix and administrator a right to said slave against all persons, unless such possession was under and by virtue of a deed, or some instrument of writing from the owner, duly acknowledged and recorded."

This instruction the court refused to give, but gave in lieu thereof the following: "That if the jury believe, from the evidence that Lucien O. Sadler, deceased, had five years adverse peaceable possession of the slave mentioned in the plaintiffs' declaration, it gives his administratrix and administrator a right to said slave against all persons."

4. "That possession of personal property is *prima facie* evidence of ownership, and if the jury believe, from the evidence, that Lucien O. Sadler, deceased, held exclusive peaceable possession of said slave for five years, it gave him a right to the property in said slave. (*Given.*)

5. "That if the jury believe, from the evidence, that said slave was the property of said Lucien O. Sadler, deceased, at the time of his death, and that said defendant became unlawfully possessed of said slave, within two years before the commencement of this suit, they must find for the plaintiffs. (*Given.*)

6. "That if the jury believe, from the evidence, that said slave was the property of the said Lucien O. Sadler at the time of his death, and that the defendant got possession of said slave unlawfully, or unlawfully detained the same, claiming him, the said negro, as his own property, within two years before the commencement of this suit, they must find for the plaintiffs. (*Given.*)

8. "That if the jury believe, from the evidence, that said slave was the property of said Lucien O. Sadler, deceased, at the time of his death, and that after the death of said Lucien O., the defendant took possession of said slave, and exercised acts of ownership over him, it was, in law, an unlawful taking; and, if they believe these facts, they should find for the plaintiffs. (*Refused.*)

9. "That the exercise of ownership and claim to property, and acts of possession of property, without the consent of the real

owner, or the person who has the right to the immediate possession, is evidence of an unlawful detention. (*Refused.*)

11. "That if the jury believe, from the evidence, that the said Lucien O. Sadler had peaceable possession of said slave, for more than five years before his death, it gave him, and those claiming under him, the right of property in said slave against all other persons, unless the said Lucien O. held the said slave under and by virtue of a deed, or other instrument of writing, from the owner, duly acknowledged and recorded in the county where said slave was possessed or held in such possession."

This instruction the court refused to give; but, gave in lieu thereof, the following : " That if the jury believe, from the evidence, that the said Lucien O. Sadler had peaceable possession of said slave for more than five years before his death, it gave him and those claiming under him, the right of property in said slave against all other persons."

12. "If the jury believe, from the evidence, that Lucien O. Sadler held peaceable possession of said slave for eight or ten years before his death, and that the defendant had previously owned said slave, and was in the country during all that time, and set up no claim to said slave, it is a circumstance from which they may presume a sale to the said Lucien O. by the said defendant. (*Given.*)

13. "That if they believe, from the evidence, that the defendant got possession of said slave after the death of the said Lucien O., and exercised acts of ownership over said slave, and claimed him as his own property, without the consent of the plaintiffs, it was a conversion of said slave, and it was not necessary for the plaintiffs to make demand of the said slave from the said defendant previous to the institution of this suit." (*Given.*)

The plaintiffs excepted to the decision of the court, refusing to give such of the above instructions as were not given as asked.

At the instance of the defendant, the court instructed the jury as follows, and plaintiffs excepted :

2. "That if the jury believe, from the evidence, that Lucien

O. Sadler, deceased, did not hold the quiet and peaceable possession of the slave Ben up to the time of his death, but had surrendered possession prior to his, the said Lucien's death, the plaintiffs cannot recover in this action upon length of possession.

3. "That when the admissions of a party are introduced in evidence, all he said in the same conversation is evidence before the jury, as well what he said in his own favor as against him."

The motion for a new trial was based upon the several exceptions taken by the plaintiffs, as above noticed, as well as that the verdict of the jury was contrary to law and evidence, &c.

The statute which is relied upon by the plaintiffs, as supporting the title of their intestate to the slave in controversy, is as follows:

*Section* 3. "The peaceable possession of slaves, acquired after the passage of this act, for the space of five years, shall be sufficient to give the possessor the right of property thereto, as against all persons whatsoever, and which may be relied on as a complete bar to any suit in law or equity.

*Section* 4. "As to slaves now held by any person, and heretofore acquired, five years peaceable possession thereof, from and after the passage of this act, shall be sufficient to give the possessor such right of property against all persons, and constitute such bar as in the preceding section specified.

*Section* 5. "The two preceding sections shall not be construed to extend to cases of the possession of slaves, where such possession is held under and by virtue of a deed, or any other instrument of writing from the owner, duly acknowledged and recorded in the county where such slaves are possessed or held." (*December* 19, 1846,) *Digest, chap.* 153, *p.* 943.

There are several cases upon the docket of this court involving the consideration of this statute ; and, in some of them, counsel have taken the bold ground that the court should disregard, and hold to be null, void and inoperative, what are supposed to be rigorous and unjust features of the statute. It may be remarked, once for all, in response to such arguments, that the power of the Legislature to pass laws limiting the time in which actions shall ·

be brought, and controversies about the title to property shall be at repose, so that all existing remedies be not cut off *eo instanti*, is now too well established to admit of question. 2 *Story's Com. on Const., Sec.* 1385, *and authorities cited.* The power being conceded, the question of policy is not for us to consider. It must be presumed, that the Legislature, in its wisdom, passed the act, to remedy some prevailing mischief, and that the welfare of the community required its enactment. Our business is to construe and administer the law as we find it upon the statute book.

The third and eleventh instructions moved by the plaintiffs, and refused by the court, are substantially the same: and the two given by the court, in lieu thereof, do not materially differ.

The plaintiffs proposed that the court should charge the jury, that if their intestate had five years adverse peaceable possession of the slave, it gave his administrators a right to the slave against all persons, unless such possession was held under and by virtue of a deed, &c., from the owner, duly recorded, &c. The object of this instruction, doubtless, was, that the court should declare that the only exception from the operation of the statute, was, that provided for in its *fifth section.*

But the court charged the jury that if Lucien O. Sadler had five years peaceable adverse possession of the slave, it gave his administrators a right to the slave against all persons. Thus the court charged the jury in a form more favorable to the plaintiffs than they asked. They proposed to make one exemption from the operation of the statute, but the court made none. If the court erred in this, it was in their favor, and they have no grounds of complaint.

But it was not necessary for the court to declare in this case, under the state of the evidence, that no exemption from the operation of the statute could be made other than that provided for in the *fifth* section, even if that were the law: such a charge would have been abstract. Because, it appears from the evidence, that during the whole period in which Lucien O. Sadler was in possession of the slave, the defendant was in full life, and rested

under no disability to assert his claim to the negro. The rights of married women, infants, persons beyond seas, *non compos mentis*, &c., such as are frequently, upon the face of the enactments, exempted from the operation of the acts of limitation, do not appear to have been, in any way, involved in this case. Nor does it appear that there was any fraud, concealment, or trust on the part of Lucien O. Sadler in connection with the possession of the slave.

The instruction, therefore, given by the court, was as broad as the facts of the case required it to be.

No substantial objection is perceived to the *eighth* and *ninth* instructions moved by the plaintiffs, and refused by the court. But their substance is embraced in the fifth, sixth, and thirteenth instructions, which were given by the court. A multiplication of instructions, announcing, in effect, the same legal principle, tends only to encumber the record, perhaps to confuse the jury, and is not to be encouraged.

The instructions given by the court at the instance of the defendant are next to be considered.

The substance of the second instruction is, that if the jury believe, from the evidence, that, plaintiffs' intestate did not hold possession of the slave up to the time of his death, but had surrendered possession to the defendant prior thereto, the plaintiffs could not recover upon length of possession.

The substance of the proof was, that Lucien O. Sadler obtained possession of the slave about the year 1839 or 1840, from the defendant, and kept him in his possession until within two or three months before his death, a period of some thirteen years, during all that time claiming and controlling him as his own property, the witnesses knowing of no other person setting up any claim to him.

It is beyond question, that such possession, by virtue of the statute above copied, vested in Lucien O. Sadler a perfect legal title to the slave. Had the defendant, after such lapse of time and adverse holding, brought suit against him for the slave, he

could have relied upon the statute as a bar to the action. Or had the slave been deforced from him, he could have maintained an action for him, relying upon the length of possession, under the statute, for title. That such is the effect of the statute, is well established by adjudicated cases, of the highest authority. See *Calvert vs. Lowell,* 5 *Eng. R.* 151; *Brent vs. Chapman,* 5 *Cranch* 358; *Shelby vs. Guy,* 11 *Wheat.* 361; *Newby's ad. vs. Blakey,* 3 *Hen. & Munf.* 57; *Lessee of Haltzapple and wife vs. Phillibaum,* 4 *Washington C. C. R.* 357; *Bradstreet vs. Huntingdon,* 5 *Peters* 403; *Cook vs. Wilson's ad. Littells' Select Cases* 437; *Stanley vs. Earl,* 5 *Littell R.* 280.

The title of Lucien O. Sadler to the slave being thus vested and perfected, whether a voluntary surrender of him to the defendant, would have been an abandonment of the title, so as to preclude his administrators from recovering the slave again, it is not necessary now to decide. There was no proof of any such surrendering of the slave to the defendant. One witness stated that he saw the slave in possession of the defendant some two or three months before the death of Lucien : that he continued in the defendant's possession until the occurring of the last illness of Lucien, and was then sent by the defendant to wait upon him, and remained with him until he died. How the defendant obtained possession of the slave, does not appear from the evidence. It could only be matter of conjecture. But, in the absence of proof to the contrary, the presumption of law would be, that his possession was consistent with the title of Lucien, unless the possession had continued so long as to divest his title under the statute of limitations.

It follows that the second instruction, given at the instance of the defendant, was not warranted by the testimony—that it was abstract, and may have misled the jury.

The third instruction given by the court, at the instance of the defendant, was probably based upon that portion of John Haines' testimony, in which he stated that at some time while Ben was in defendant's possession, the negro passing the door, Duncan

asked defendant, whose negro he was? To which defendant replied that he belonged to him, and always had.

Perhaps this declaration of the defendant was introduced by the plaintiffs (if by them introduced) to conduce to show such conversion as would dispense with proof of demand before suit.

If introduced by the plaintiffs for their purpose, it would also be evidence in favor of the defendant for what it was worth. But in determining its value, the jury should compare its consistency with the other testimony in the cause, and so form their opinion of the weight to be attached to it. *Gracie vs. Robinson*, 14 *Ark.* 441; 1 *Greenleaf Ev.*, sec. 201. The third instruction should have been thus qualified.

The judgment is reversed for the errors above indicated, and the cause remanded with instructions to the court below to grant the plaintiffs a new trial, &c.