[STATUTE OF LIMITATIONS. PLEADING. LOCAL LAW.]

## SHELBY and Others, Executors of SHELBY, *Plaintiffs in Error,* *against* GUY, *Defendant in Error.*

The terms " beyond seas," in the saving clause of a statute of limitations, are to be construed as equivalent to *without the limits of the State* where the statute is enacted.

*Quære,* How far this construction has been adopted by the Courts of Tennessee ?

Five years *bona fide* possession of a slave constitutes a title, by the laws of Virginia, upon which the possessor may recover in detinue ; and this title may be set up by the vendee of such possessor in the Courts of Tennessee, as a defence to a suit brought by a third party in those Courts.

THIS cause was argued by Mr. *Jones,* for the plaintiffs in error, and by the *Attorney General* and Mr. *White,* for the defendant in error. *Feb. 28th.*

Mr. Justice JOHNSON delivered the opinion of the Court. *March 10th.*

The plaintiffs here, were defendants in the Court below, in an action of detinue brought by Thomas Guy, to recover sundry slaves.

The defendants below plead *non detinet,* and the act of limitations of the State of Tennessee, which bars the action of detinue in three years.

The plaintiff joins issue upon the plea of *non detinet,* and files a special replication to the plea

1826.

Shelby
v.
Guy.

of the statute, the object of which is to bring himself within the saving in favour of absentees. The defendants demurred to this replication, but the demurrer being overruled, the parties went to trial on the general issue, and a verdict was rendered for the plaintiff in the form now usual in the action of detinue.

To revise the judgment of the Court in overruling the demurrer, and its decisions upon various points of law raised in the progress of the trial, this writ of error is brought.

The case was this. One Dickerson, a citizen of Virginia, the father of the plaintiff's mother, was owner of a female slave named Amy, from whom the slave claimed had descended. Upon the marriage of Thomas Terry Guy with the plaintiff's mother, or soon after, and prior to the year 1778, the slave Amy passed into the possession of T. T. G., but whether by loan, or parol gift, is a point litigated, and upon which some of the principal questions in the cause arise.

From the year 1778 to 1794, the slaves remained in Virginia, in the possession of the plaintiff's father T. T. G., when he sold her and her increase to David Shelby, who thereupon removed with the slaves to Tennessee, where he and they have ever since resided.

In the year 1788, Dickerson made his will and died; and the will was proved and recorded in July, 1788. In this will he says, " I lend to my son-in-law T. T. G., the negroes which he now has in his possession, that I lent him in the lifetime of his wife, during his natural life, viz.

Cuffee, Gilbert, and Amy; and at his death I give the aforesaid slaves, with their increase, to my grandsons John and Thomas Guy, and their heirs, for ever."

Thomas Guy, here named, is the plaintiff in this action; the executory devise to him and John, took effect by the death of their father in 1795. John died unmarried, under age, and intestate, after his father, but before the action brought, and neither of the brothers had been in the State of Tennessee until within three years prior to the institution of the suit, but had resided in the State of Virginia.

These are the material facts in the cause. The points argued have been very numerous; but if the plaintiff has tripped in pleading, by a vicious replication, the questions on the merits are put out of the case. The points arising on the demurrer, therefore, must first be considered.

Alleged defects in the pleadings.

The replication demurred to, states, in substance, the right of Dickerson to the negro Amy, and the continuance of that right up to his death; the bequest to the father of the plaintiff for life, and to the plaintiff and John after his death; the death of the father, and of John; the qualifying of the executors on the will, and their assent to the legacy; the sale by the father to Shelby in 1794; Shelby's removal with the slaves to Tennessee, and subsequent residence there, and the residence of John up to his death, and of the plaintiff, to within three years of the bringing of this suit, in the State of Virginia.

The demurrer filed to this replication is spe-cial, and assigns for cause,

1. That it states the evidence of title, and does not allege a fact.

2. That it is double, in relying on the facts both of title and of non-residence.

But, claiming the right of looking back to the first fault, and other benefits appertaining to a general demurrer, to which, no doubt, he is en-titled, the counsel for the defendant have raised a variety of other questions in the cause, of more interest than those specified.

As, *first*, that the counts in the declaration are repugnant, the one being essentially a count in trover, the other in detinue ; and,

*Secondly*, that the replication involves a depar-ture, inasmuch as the writ claims the whole pro-perty, and the replication shows him to be enti-tled to no more than a moiety.

That the replication is more characterized by prolixity, than by science, the Court will readily admit ; but that it is essentially vicious, cannot be maintained.

The general object of the plaintiff is to fortify his title or demand, and this is a legitimate ob-ject. Nor can we perceive, that in doing this, he has either stated evidence where he ought to allege facts, or tendered to the defendant a double answer to his plea, or, rather, " distinct matters to one and the same thing, whereunto several answers are required." That it is redundant, and abounds in surplusage, with reference to the issue tendered, is obvious : but it prefers only one

answer that will fit the plea, which is, absence from the State of Tennessee during the term when the statute would bar him.

Yet, as he has thought proper to amplify upon the nature of his demand, if he had prostrated his own action, the law would visit him with the consequences.

The argument on this point is, that having set out a joint devise to himself and his brother, he is incapable of maintaining alone a suit for the entirety of the thing devised. But, in this, we are of opinion, that the law is with him.

It is true, that tenants in common must ordinarily join in an action, and that the laws of Virginia produce a severance upon the death of a joint tenant, so that the right of survivorship is abolished. But, it is also true, that in suits for an indivisible thing, a right of action survives to a tenant in common ; and this, from the necessity of the case, as we conceive the authorities sufficiently maintain. (*Co. Litt.* 198 a. *Bro. Abr.* tit. *Tenant in Common*, pl. 18.)

The exceptions to the counts clearly cannot be sustained. They are consubstantial, and the same plea and judgment proper to both. Averring that the defendant came to the possession of the chattel by finding, does not constitute a count in trover ; an alleged conversion characterizes that form of action. Nor is it any objection to the counts, that one of them states a right to recovery founded in a possession merely, without the direct allegation of property, since a tortious letention may well be of that which another has

1826.

Shelby
v.
Guy.

Question upon
the statute of
limitations.

no interest in, but to the temporary use or custody. (*Co. Litt.* 286. *Roll. Abr.* 575.) Thus, a bailee, or common carrier, or sheriff, may maintain this action, and expressly against one who has them by delivery or finding. (2 *Saund.* 47. *Cro. Jac.* 73. *et passim.*) We come, then, to the question raised by the demurrer upon the statute of limitations of Tennessee; and here we are met by one of those embarrassments which necessarily grow out of our peculiar system.

North Carolina, in common with most of the old States, adopted the language of the statute of James in its act of limitations. This was the law of Tennessee before its separation from that State, and continues so to this day. The persons excepted from its operation, are infants, femes covert, &c. and " persons beyond seas."

During a century nearly that this law has been the local law of that country, we cannot ascertain that the Courts of either of those States have been called on to decide whether it shall be construed according to its literal meaning. In the meantime, solemn adjudications have taken place in several of the States, to the purport, that persons without the jurisdiction of the country, though not actually beyond seas, are within the equity, if not within the actual meaning, of the statutes containing the same words,

Murray v. Baker, 3 *Wheat.* *Rep.* 541.

and borrowed from the same source. And in a case which came up to this Court from Georgia, in the year 1818, it was solemnly decided, that it was impossible to give a sensible and reasonable

construction 'to those words according to their literal signification. But, we are now informed, and, as it is admitted by the opposite counsel, we cannot question it, that a contrary adjudication has taken place in the Courts of Tennessee within the last year, for the first time. It is obvious, that without a more particular report of that adjudication, this Court could not now act finally upon its authority. But if the majority of the Court were of opinion, that an insulated decision on a point thus circumstanced, ought to control the previous decision of this Court, the course would undoubtedly be, to hold up this cause for advisement.

That the statute law of the States must furnish the rule of decision to this Court, as far as they comport with the constitution of the United States, in all cases arising within the respective States, is a position that no one doubts. Nor is it questionable, that a fixed and received construction of their respective statute laws in their own Courts, makes, in fact, a part of the statute law of the country, however we may doubt the propriety of that construction. It is obvious, that this admission may, at times, involve us in seeming inconsistencies; as, where States have adopted the same statutes, and their Courts differ in the construction. Yet that course is necessarily indicated by the duty imposed on us, to administer, as between certain individuals, the laws of the respective States, according to the best lights we possess of what those laws are. This Court has uniformly manifested its respect for

1826.

Shelby
v.
Guy.

Construction
of local statutes.

the adjudications of the State tribunals, and will be very moderate in those claims which may be preferred on the ground of comity. Yet, in a case like the one now occurring, it cannot acknowledge the objection to go farther, at present, than to examine the decision formerly rendered, on the construction of these words.

We have reflected, and heard arguments on our former decision, and not a doubt has been entertained, except on the question how far we were bound to surrender an opinion, under the actual state of difference existing between our construction, and that of the State from which this cause comes.

It is true, that the words, " beyond seas," considered abstractedly, must, in every State in this Union, mean something more than " without the limits of the Commonwealth ;" which words the State of Virginia has very properly added to the statute of James. But, it is also true, that if the words " beyond seas" be considered with reference to the insular situation of the country from which we adopted the law, they mean exactly the same as the words superadded in the Virginia law. And it was this consideration, as well as the obvious absurdity of applying the terms " beyond seas," in their literal signification, that induced this Court, and has induced so many State Courts, to give it the meaning of *beyond the Commonwealth.*

If equity, as applied to the construction of statutes by an eminent writer, means, " the correction of that wherein the law, by reason of

its universality, is deficient;" or, as another de- <span>1826.</span>
fines it, " interpreting statutes by the reason of <span>Shelby</span>
them," may be applied to any case, we think it <span>v.</span>
may to one, which, while it operates in restraint <span>Guy.</span>
of common right, would, by a literal construc-
tion, make no saving in favour of persons resi-
ding in the most distant and unfrequented parts
of this extensive continent.

Nevertheless, as this cause must go back upon
other grounds, we will, for the present, waive a
positive decision on this point as applied to the
State of Tennessee, trusting that the Courts of
the State from which this cause comes will, in
due time, furnish such lights upon the fixed law
of that State on this subject, as will enable the
Courts of the United States to come to a satis-
factory conclusion upon the question.

The next class of questions in the cause arise
under bills of exception. The object of the de-
fendants, in the several prayers for instructions
propounded to the Court, was to be let into proof
of a title, without will or deed, in the father of
T. T. G., from whom they purchased, and to
maintain, that although that title was only de-
rived to him by implication under the limitation
acts of Virginia, it was sufficient, not only to
make out a defence by pleading, but by giving
such facts in evidence as would be a good de-
fence on a plea of the statute of limitations, if
the suit were instituted in the State of Virginia,
or to maintain detinue in a suit to recover in right
of a possession under the statute in that State.

1826.    With this view, he proposed to rely on the follow-
Shelby   ing propositions :
v.          1. That the proof that Dickerson, on the mar-
Guy.     riage of Guy with his daughter, had sent the
slave in question with them, or to them, upon
their going to house-keeping, and permitted her
to remain there ever after as their property, with-
out any specific declaration of the interest vest-
ed in them, other than the will of 1788, with a
variety of corroborating facts, was sufficient to
sustain an inference of a gift or transfer by pa-
rol, and of such an adverse possession as might
constitute a bar under the act of limitations of
Virginia of 1705.

This the Court refused, on the ground that a
parol gift of slaves in Virginia was, at the date
of that transaction, absolutely void.

In this, it is contended, the Court erred, both
as to the law, and as to its application to the
case.

Whether a    As to the law, we are of opinion, that the
parol gift of
slaves was va- question is not now to be stirred. We do not
lid by the laws
of    Virginia mean to intimate an opinion on the construction
previous to the
act of 1787. of the acts of 1757 and 1758, on this subject ;
but only to treat it as a decided point upon the
construction of those statutes, that a parol gift
of slaves made in Virginia, even where the pos-
session passed, between the years 1757 and
1787, was void, or voidable ; for, as to all the
purposes of this case, it is immaterial which.
The declaratory act of December 31, 1787, we
regard as a new enactment, taking effect from
its date, as a repeal of the prior acts in those

cases in which the possession passed with the 1826. gift. The possession here relied on was from Shelby v. Guy.
1775 to 1788, at which time the will was record-
ed. And here, the material question arises,
whether, if void or voidable, it does not create
such an adverse interest in the donee, as the sta-
tute of 1795 may attach upon, so as to vest a
complete interest. And, on this point, we think
the Court erred in rejecting the proof. For, al-
though the gift may have been void or voidable,
the fact of delivery of possession attended it,
and this must have put the party to his action to
reinstate himself in the enjoyment of the pro-
perty. The limitation to the action of detinue in
Virginia, is five years; and here the supposed
donee proves a possession of ten years.

How far the Court below erred in re-jecting the proof.

There can, then, be but one doubt raised on
the right of the defendant to the instruction here
prayed, and to the admission of the evidence of-
fered to the fact of a parol gift, and that is,
whether he could avail himself of this defence
in this mode.

In the case of *Newby* v. *Blakley*, (3 *Hen. &*
*Munf.* 57.) a case strikingly resembling this in
its circumstances, it was adjudged, that a plain-
tiff, in Virginia, may recover in detinue upon five
years peaceable possession of a s̀ a e acquired
without force or fraud. And, four months after
that decision, and obviously without being ap-
prised of it, this Court, in the case of *Brent* v.
*Chapman*, maintained the same doctrine. (5
*Cranch's Rep.* 358.)

Five years possession of a slave consti-tutes a title by the laws of Virginia, which might be set up as a defence by the defendant in the Courts of Tennessee.

It follows, we think, that, on the same princi-

Shelby
v.
Guy.

ple, such a possession must constitute a good defence in Tennessee.   To preclude the defendant from availing himself of the benefit of that evidence which would have sustained an action for the same property by the person from whom he purchased it, would be to convert a good and valid title in Virginia, into a defeasible title in Tennessee ; a sufficient title in a vendor, into a defeasible title in_ his vendee ; and, by an indirect operation, to make the seller liable, where a direct action could not have been maintained against him to recover the property sold.

Second exception.
The second prayer is calculated to obtain of the Court an instruction, that, after an indefinite loan to Guy the father, a subsequent devise to his children, if intended to save the slaves from his creditors, was inoperative as to Guy, and purchasers for valuable consideration claiming under him, unless with actual notice of the will.

On this, it is sufficient to remark, that as there were no creditors before the Court, the Court was under no obligation to speculate upon the possible effect of their interests upon the case. And this gets rid of the influence of the decision in *Fitzhugh* v. *Anderson*, on the cause, as will be more particularly shown in a subsequent part of this opinion.   The defendant here, was a purchaser from T. T. G. at the time when the will of the grandfather was of record.   How far purchasers are affected with record notice, is obviously a point of local law.   And, we understand, that much importance is attached to it in the jurisprudence of Virginia.   Certainly, in or-

dinary cases, where such a source of information
is open to all, those who do not avail themselves
of it come with an ill grace before a Court to
complain of imposition.

The third prayer was intended to maintain, that, on the circumstances of the case, the jury might infer both a deed, and the recording of that deed. Broad as this claim was, it is obvious, that the Court was not bound to give the instruction, since it would have availed the party nothing, without the additional fact of the loss or extinction of the record also.

Third exception.

The fourth prayer had relation to the question, whether the right of action survived to the tenant in common, which has been already answered. As Thomas Terry Guy died before his son John, the executory devise to John and the plaintiff became vested in possession. Their right of action then accrued, and that right survived to this plaintiff, whatever may be the ultimate distribution of the slaves when recovered. This also was rightfully refused.

Fourth exception.

And the same remark answers many of the exceptions taken to the charge which the Court below did give, upon the sufficiency of the plaintiff's cause of action, and the form of laying it.

Other exceptions are taken to the legal doctrines of that charge; one of which is, that, under the Virginia statute of frauds of 1785, the loan, with five years possession, became a vested title in T. T. G.; another, that upon the general doctrines of Courts of law, on the subject of frauds imputable where the possession remains

in one, and the right in another, this will should be adjudged a mere cover and evasion, or a new devise for the perpetration of fraud.

But, on these subjects, we think it unnecessary to remark at any length; the dates and facts do not bring the case within the operation of the statute of frauds of 1785; and, with regard to the general doctrine, it never has been supposed to extend to a purchaser with notice, much less to a purchaser whom the local law affects with notice of the highest order. Had the defendant, in this instance, been a creditor of T. T. G., who had trusted him on the faith of this property, and now sought relief under the principle in *Twyne's case*, the decision in *Fitzhugh* v. *Anderson*, (2 *Hen. & Munf.* 289.) might have applied. That case was expressly decided upon the principle in *Twyne's case.* The complainants were legatees of their grandfather, under a will that was not recorded until three years after the creditors (who were defendants) had sold the son's slaves under execution; slaves which he had held in possession for fifteen years, under a loan, which was never avowed until the slaves were set up for sal', and which there was obviously much cause for bringing into serious suspicion.

Judgment reversed, and a *venire facias de novo* awarded.