Harlan and Sharon NOLTE, et al., Plaintiffs,

v.

Stanley F. PEARSON, et al., Defendants.

Nos. CV 87-0-578, CV 87-0-613, CV 87-0-625, CV 87-0-642, CV 87-0-606, CV 87-0-623, CV 87-0-641 and CV 87-0-643.

United States District Court,
D. Nebraska.

Dec. 7, 1990.

---

George Qualley, Omaha, Neb., for plaintiffs.

## MEMORANDUM AND ORDER

RICHARD G. KOPF, United States Magistrate Judge.

Certain of the defendants have moved to disqualify plaintiffs' counsel on the grounds that plaintiffs' counsel either ought to be called as a witness for plaintiffs or will be called as a witness on behalf of the defendants in the trial of these cases. (Filing 274). Counsel for the plaintiffs and plaintiffs have filed a responsive motion seeking sanctions for the filing of the motion to disqualify (Filing 275). I shall deny the motion to disqualify plaintiffs' counsel (Filing 274), and I shall deny the motion for sanctions (Filing 275). However, I shall require plaintiffs to establish that their decision not to call their counsel as a witness is an informed decision.

### I. FACTS

#### A. *Background*

Plaintiffs, as investors, bring this action against various defendants who either promoted or who were allegedly associated with the promotion of various tax shelters. The defendants moving for disqualification are a partnership of lawyers and the constituent partners who were allegedly associated with the promoters of the tax shelters. For ease of reference, I shall refer to the moving defendants as "attorney defendants." Plaintiffs are represented by George Qualley of Qualley & Associates, formerly known as Qualley, Larson & Jones.

The attorney defendants claim that Mr. Qualley was retained as counsel for the investors in late 1983 and early 1984 to

represent the plaintiffs in litigation with the Internal Revenue Service (IRS) over the tax deductibility of the investments at issue. The attorney defendants also claim Mr. Qualley knew of related litigation filed in 1985. The attorney defendants claim that Qualley was on notice of the existence of claims against the attorney defendants long before he filed suit in 1987. The attorney defendants argue in their brief that Qualley is an important witness on the statute-of-limitations defense raised by them:

> Mr. Qualley is a witness on behalf of his clients on a number of issues. Of particular significance will be testimony at time of trial concerning the statute of limitations issue. As the court is well aware, the attorney defendants have raised the statute of limitations as a defense and plaintiffs have responded by asserting claims of fraudulent concealment and inability to discover the cause of action until the time of the *U.S. v. Clark* tax trial in March of 1987. The tax shelter investments in question concern investments made in 1980, 1981 and/or 1982. The investors learned starting in June and July of 1983 that the IRS was disallowing their investment tax credits. Mr. Qualley was retained as counsel for the investors in late 1983 and early 1984.

> Generally plaintiffs relied upon counsel to investigate the program on their behalf. This by necessity would require counsel to determine whether or not the investors investment tax claims were legitimate and if they were not appropriate as to whether or not the investors may have theories of recovery against sellers, promoters or other professionals involved in the organization of the program. It is defendant's position that plaintiffs relied upon counsel to discover and advise them concerning any causes of action or theories of recovery that they may have with regard to their investment in the Music Leasing tax shelter programs. Although at time of trial, defendants will offer evidence to show an earlier discovery of the causes of action, one of the dates defendants will

offer evidence on concerning discovery is the retention of counsel.

> Since plaintiffs did retain counsel to represent their interests, at a point in time they contend their causes of action had not yet expired, it is important for the jury to hear evidence and testimony from Mr. Qualley as to why it took an additional three to four years to discovery [sic] the cause of action. It is difficult to understand plaintiff's position concerning the concealment of the discovery of the causes of action since lawsuits were brought by other investors as early as 1984 and 1985. Plaintiff's counsel knew of this other litigation long before he filed suit on behalf of his clients in the within action.

(Brief in Support of Motion to Disqualify at 4–6).

The plaintiffs respond by stating that they have no intention of calling Mr. Qualley as a witness and that plaintiffs individually are competent to respond to the defendants' assertions that plaintiffs should have discovered the cause of action sooner. (Memorandum of Law in Opposition to Defendants' Motion to Disqualify and in Support of Motion for Sanctions at 3–4).

### B. *Plaintiff's Investments*

In order to understand the motion to disqualify, it is helpful to understand the nature of the investments made by the plaintiffs in this case. The plaintiffs invested in various partnerships. The business purpose of these partnerships was to lease master music recordings by performing artists from a lessor and, thereafter, to exploit the leased master recordings by selling albums and tapes produced from the masters. As will be seen, a substantial attribute to the investments was the ability to take certain tax deductions.

The transactions worked something like this. The partnership sought out master recordings to lease. A company, Music Leasing Company, for example, purchased various master recordings from a third party. The purchase price of the master might be one million dollars. Music Leasing Company would in turn pay $19,800 in cash for the master recording and sign a

note for the remaining balance on the master, or \$980,200. The investment partnership would then acquire from the lessor, Music Leasing Company, the exclusive leasing and distribution rights for the master. The partnership would pay \$85,000 for the first twelve months of the lease and lease payments thereafter which were apparently based upon a minimum monthly rental fee. In return, the lessor, who had acquired the master by purchase, would pass the investment tax credit through to the partnership. The investment tax credit would then be determined on the fair market value of the master recording as evidenced by the purchase price (one million dollars) the lessor had agreed to pay the seller during the supposed arm's-length transaction involving the exchange of the master recording for cash and a note. For each master recording the lessor supposedly obtained an independent expert appraisal establishing the fair market value of the master recording.

Among other things, it is alleged that the attorney defendants were engaged by the leasing company to provide a legal opinion regarding the tax benefits to be derived by individuals as a result of their investment in the master recordings. It is contended that the attorney defendants made certain misrepresentations or errors in the legal opinion, among those being that they had independently examined the bona fides of the program as an investment opportunity for potential investors and that they were aware of no facts which were in conflict with those set forth in the legal opinion, when they knew or should have known that numerous facts contained therein were false. Important among the alleged false statements was the representation that at the time of closing the leasing company would receive independent appraisals by qualified experts, when in fact the appraisals would not be conducted by independent appraisers but would contain fair market values for each of the master recordings which were essentially determined by the leasing company.

### C. *Qualley And The IRS*

After certain of the investors began to take the tax benefits, the IRS challenged the investments (Defendants' Exhibit 16). The IRS took the position that:

(a) purchase of the master recordings was not an arm's-length transaction;

(b) the appraisals were grossly inflated;

(c) the lessor's note was not a recourse note;

(d) the agreement between the investment partnership and the lessor lacked economic reality;

(e) the distribution agreement (the investment partnerships had entered into agreements to promote the masters) lacked economic reality; and

(f) the motive for the entire transaction was to procure tax savings, not profits, and it was in effect a sham (Defendants' Exhibit 16 at 6).

Sometime in either late 1983 or early 1984, the law firm of Qualley, Larson & Jones was employed by certain of the investors in the partnerships to contest the position of the IRS. Although Mr. Qualley did not personally author the "letters of protest," certain of his associates and partners did prepare documents submitted to the IRS protesting the position of the IRS on behalf of the investors (Defendants' Exhibit 16). Among other things, the letters of protest took the position that the notes were recourse notes and the appraisals were those of independent experts. (Defendants' Exhibit 16 at 6, 13–14). The lawyers who signed the protest letters stated at the conclusion of the protest letters that:

> The undersigned counsel for the taxpayer prepared this protest on behalf of the taxpayer, but do not personally know that the statements of fact contained in the protest and accompanying documents are true and correct.

(Defendants' Exhibit 16 at 15).

Thus, for practical purposes, the law firm of Qualley, Larson & Jones submitted the protest letters without investigating the statements of fact contained in the various agreements, notes and appraisals which formed the subject matter of the protest.

## D. *Qualley And The 1984 Seminar*

On March 10, 1984, a "seminar" was held in Omaha, Nebraska, wherein one of the promoters brought Eugene Weiss to speak to the investors. The meeting was video-taped (Defendants' Exhibit 4). The purpose of the seminar is not entirely clear, but at least one of its goals was to describe to the investors the efforts the promoters were making to ensure the deductibility of the investments. Weiss was presented as one of only eight people in the United States qualified to appraise master record-ings for the IRS. Although Weiss appar-ently had not actually done all the apprais-als at issue, he implied that he had re-viewed them all and he also implied that the appraisals would stand up against IRS challenge.

George Qualley was also at the seminar. He was asked to give a status report to the investors about the various letters of pro-test. Among other things, Qualley dis-cussed the fact that although the IRS had challenged the appraisals relied upon by the investors, it refused to provide copies of the IRS appraisals. Qualley was also asked whether the notes were properly classified as recourse or nonrecourse notes and Qualley gave the general answer that in his opinion the notes were recourse notes. Qualley also stated that in his view the most difficult issue for the investors was the valuation of the master recordings.

### E. *Qualley And Bachman*

In about May, 1985, another lawyer, James Bachman, was contacted by various investors, many of whom were not repre-sented by Qualley. As a result of those contacts, certain of the investors who visit-ed with Mr. Bachman contacted other in-vestors with the apparent idea that those other investors should also contact Mr. Bachman. Two of the "other" investors were Charles and Susan Kral. The Krals were then represented by Qualley before the IRS. They subsequently contacted Mr. Bachman, and Mr. Bachman and the Krals then engaged in a series of correspondence (Defendants' Exhibits 1, 2 and 3).

Although it is not clear precisely how it happened, Bachman, on behalf of the Krals

and numerous other investors, filed a law-suit against the present attorney defen-dants and others in 1985. The first of Bachman's suits was filed May 7, 1985. *Kelly, et al. v. Rosenbaum, et al.*, CV85-0-492 (D.Neb.) (date complaint filed May 7, 1985).

The Krals then advised Bachman that they did not wish to remain in the lawsuit which he had initiated. Bachman respond-ed by letter on May 30, 1985 (Defendants' Exhibit 3, May 30, 1985). In pertinent part Bachman stated:

Per your letter, you have stated that you are currently litigating this shelter with the Internal Revenue Service. Un-der no circumstances should the follow-ing discussion be interpreted to question your other attorneys' advice because I am stating my opinion on my personal experience.

The general rule regarding a security fraud case involving a tax shelter is that you must litigate the shelter with the IRS to prove that it was improper. The exception to this rule is that if the errors alleged were extremely serious, you do not challenge the IRS, but you proceed directly against the promoters.

(Defendants' Exhibit 3, May 30, 1985).

Bachman explained that he believed an IRS settlement offer should be accepted and that the Krals should be careful not to withdraw their participation in the lawsuit because of possible statute-of-limitations problems having to do with a state law securities claim (Defendants' Exhibit 3, May 30, 1985).

On June 25, 1985, Bachman again corre-sponded with the Krals. Among other things, Bachman explained that he thought a Nebraska statute dealing with state secu-rities law was "our strongest cause of ac-tion" because it permitted the plaintiffs to sue for interest, costs and attorneys' fees (Defendants' Exhibit 3, June 25, 1985). Bachman discussed the various causes of action included in the 1985 lawsuit, which were seven in number:

(a) failure to register in Nebraska;

(b) failure to register federally;

(c) liability premised upon material omissions on the federal level;

(d) liability premised upon material omissions on the state level;

(e) the attorney defendants were recklessly negligent;

(f) violations of the federal Racketeer Influenced Corrupt Organizations Act (RICO); and

(g) common-law fraud.

(Defendants' Exhibit 3, June 25, 1985).

Bachman further opined that the attorney defendants were a "'deep pocket'" and that the attorney defendants were the only defendants who would be able to respond to a money judgment. (Defendants' Exhibit 3, June 25, 1985). In the context of discussing the various causes of action, Bachman noted that certain of the securities causes of action had a two-year statute of limitations, but the causes of action based upon common-law fraud had a four-year statute of limitations. Bachman also stated that, while he did not question Qualley's advice to the Krals, since there was such a strong disagreement between professionals as to the course the various investors should take, given the offer of the IRS to settle the matter, the Krals should obtain an independent opinion. Bachman also sent along a statement to be signed by the Krals acknowledging this advice. By deposition, the Krals have admitted that they received Bachman's letter and discussed it with Qualley (Defendants' Exhibit 10, TR 250: 6–25; 251:1).

On September 9, 1986, Bachman again corresponded with the Krals (Defendants' Exhibit 3, September 9, 1986). In that letter Bachman discussed, by reference to a reported court decision, whether the notes at issue were in reality nonrecourse notes. (If the notes were nonrecourse notes, the IRS's position would have been valid.) Bachman added that one of the defendants in his case had pled guilty to fraud "pertaining to the original purchase of the master recordings that you leased from him. In his guilty plea, he admitted that the notes which were used to purchase the recordings were shams" (Defendants' Exhibit 3, September 9, 1986). Bachman reiterated that he recognized that the Krals had retained another lawyer in the matter and stated that he was "not trying to question or criticize the advice that [the other lawyer] has given you pertaining to your investment in this tax shelter" (Defendants' Exhibit 3, September 9, 1986). Bachman asked the Krals to contact him with regard to the advisability of dismissing the lawsuit.

On October 31, 1986, apparently for the first time, Qualley wrote Bachman regarding the matters at issue (Defendants' Exhibit 3, October 31, 1986). In that letter Qualley, pursuant to instructions received from the Krals, demanded that Bachman take immediate action to remove the Krals as plaintiffs in the suit.

Bachman responded on November 7, 1986 (Defendants' Exhibit 3, November 7, 1986). In that letter Bachman advised Qualley that in his opinion if the Krals were dismissed the statute of limitations might expire on several, if not all, of the causes of action put forth by Bachman (Defendants' Exhibit 3, November 7, 1986).

Thereafter, on June 30, 1987, Bachman moved to withdraw and the court granted the motion (Exhibit 3, Motion and Order).

During the time that Bachman corresponded with the Krals, Qualley was engaged in contesting and litigating the tax issues with the IRS. Bachman has been identified as a witness for defendants in this case. He will testify that Qualley should have known of the lack of economic substance to the notes in question at or about the time Bachman filed suit in 1985.

## F. Plaintiffs' Claims And The Pretrial Conference Order

As set forth in the second amended complaint (Filing 70), the plaintiffs contended that the promoters had hired Eugene Weiss, that the promoters recommended Weiss to the investors in the programs and that Weiss was hired by the promoters to prepare false and fraudulent appraisals (Filing 70, ¶ 60a–d). The second amended complaint further alleges that in March, 1984, Weiss met with investors in the programs and falsely represented that he was

a qualified appraiser actively employed by the IRS when in fact he was no longer being utilized by the IRS; that the IRS was currently disallowing all deductions taken with respect to master music recordings only because there were certain non-bona fide programs being sold, although plaintiffs' investments were legitimate; that the music leasing programs at issue were the first such programs Weiss had seen which would meet the scrutiny of the IRS; that the appraisals prepared by appraisers for the music leasing program represented bona fide market values which could be supported in terms which would be acceptable to the IRS when Weiss knew that the manner in which the master recordings had been appraised by himself and others would not be accepted by the IRS; and that the masters leased by the leasing programs represented a genuine opportunity for profit when Weiss knew or should have known that the cost of manufacturing, selling and distributing the products of the master recordings would far exceed any profits which could reasonably be expected to be generated by such sales (Filing 70, ¶ 60e). In the second amended complaint plaintiffs allege that despite good-faith efforts to inquire into the truth of the various statements and representations, plaintiffs did not and could not have discovered that the statements were false until March of 1987 when Eugene Weiss apparently gave deposition testimony wherein he acknowledged under oath that his appraisals and statements made to plaintiffs and others on March 10, 1984, were false (Filing 70, ¶ 62 and ¶ 70; Filing 269, Pretrial Conference Order, ¶ D, Addendum 4, ¶ I, 21(d)(3)).

The instant lawsuits were filed in 1987. The first of these lawsuits was filed August 11, 1987. *Nolte, et al. v. IFC Leasing Corp., et al.*, CV87-0-578 (D.Neb.) (date complaint filed August 11, 1987). In the final pretrial conference order (Filing 269), entered on October 9, 1990, plaintiffs assert the following causes of action:

(a) fraud;

(b) civil conspiracy;

(c) RICO;

(d) negligent misrepresentation; and

(e) negligence.

In that pretrial conference order the defendants notified the plaintiffs for the first time that the defendants intended to call Qualley as a witness to testify specifically in regard to issues and positions taken with the IRS and questions about the statute-of-limitations issues and the discovery of the causes of action. In the pretrial conference order plaintiffs contend that one or more four-year statutes of limitations apply. Defendants contend that a two-year statute of limitations applies but that even if a four-year statute of limitations applies, all of the causes are time barred. The defendants were instructed to file a motion to disqualify (Filing 268) and their motion to disqualify was filed after entry of the pretrial conference order.

### G. Depositions Of Qualley And Plaintiffs

In their depositions in this case the plaintiffs have testified that they relied upon Mr. Qualley to advise them how to proceed in this litigation and the litigation involving the IRS. (Defendants' Exhibits 6–15).

George Qualley's deposition was taken by Bachman in Bachman's suit against the attorney defendants (Defendants' Exhibit 5). Although Qualley asserted the attorney-client privilege on a variety of matters, he did testify about a number of issues pertinent to the motion currently under review.

Qualley testified that he attended the seminar in March of 1984 where Eugene Weiss spoke and found that Weiss was believable, that Weiss represented that he had appraised master recordings for the IRS, as well as the private sector, that Weiss had substantial prior employment with well-known record companies and that Weiss had given an opinion that the appraisals he and others had done for the programs at issue were valid (Exhibit 5, TR Vol. I at 60: 16–66: 1–12). Qualley testified that it was his impression that Weiss would support the appraisals if called to testify (Exhibit 5, TR Vol. I at 67: 2–11).

Qualley was asked the following question and, over objection by counsel for the

**592**

attorney defendants, gave the following answer:

Q When did you find out that the masters were not to be as they had been represented?

A Well, we found—

MR. MCCANN:

Objection, lack of foundation. Calls for a conclusion on behalf of the witness. Mr. Qualley, go ahead.

THE WITNESS:

A —we found out that during the Clark trial when I—as I testified before, Mr. Weiss, during the deposition, did a 180–degree turn on his prior testimony.

(Exhibit 5, TR Vol. II at 49: 2–11).

Over further objection by counsel for the attorney defendants that Qualley was a fact witness, not an expert witness, Qualley was asked when he determined that the programs at issue were not bona fide programs (Exhibit 5, TR 91:15–25; 92:1–13). Qualley responded saying that he concluded that it was a "three-dollar bill during the course of the Clark trial" in 1987 (Exhibit 5, TR 92:14–22).

## II. LAW

### A. *Motion To Disqualify*

Local Rule of Practice 5(B) provides that this court will employ the Code of Professional Responsibility adopted by the Supreme Court of Nebraska. Disciplinary Rule (DR) 5–102(A) and (B) constitute the relevant sections of the Code pertinent to the issues here. DR 5–102 provides as follows:

(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (4).

(B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.

It is important to distinguish between DR 5–102(A) and DR 5–102(B). As will be pointed out hereafter, there are significant differences between these two subparts of the disciplinary rule. I shall discuss the applicability of DR 5–102(A) to the facts of this case and then turn to DR 5–102(B).

### 1. DR 5–102(A)

■ In this case the pretrial conference order clearly indicates that the plaintiffs have no intention of calling Qualley as a witness. The question then becomes whether or not Qualley "ought to be called as a witness on behalf of his client[s]", as that phrase is understood pursuant to DR 5–102(A).

■ The plaintiffs took the position in their brief, and at the evidentiary hearing, that having stated in the pretrial conference order that they do not intend to call Qualley as a witness, such a declaration concludes the matter. I disagree. Virtually all of the courts that have considered the matter have concluded that the simple declaration by a client that he will not call his attorney as a witness is not alone sufficient to avoid disqualification if objectively the lawyer "ought" to be called as a witness on behalf of the client's cause. *J.P. Foley and Co., Inc. v. Vanderbilt*, 523 F.2d 1357, 1359 (2nd Cir.1975); *Times Herald Printing Co. v. Dallas Morning News Co.*, 1987 WL 20411, Slip Op. at 2 (N.D.Ill. Nov. 25, 1987); *McArthur v. Bank of New York*, 524 F.Supp. 1205, 1208 (S.D.N.Y.1981). Accordingly, I look to whether Mr. Qualley "ought" to be called as a witness based upon the evidence presented to me. I will not merely conclude that the issue has been mooted because the pretrial conference order indicates that the plaintiffs, through Qualley, have indicated that they do not intend to call him as a witness.

In beginning this analysis it must first be observed that the defendants bear the burden of establishing that Qualley "ought" to be called as a witness by his clients. *Times Herald Printing Co. v. Dallas Morning News Co.*, Slip Op. at 5. Although some courts have imposed a less burdensome standard, most courts construe the phrase "ought" to mean that the advocate-witness testimony is "crucial" or "obligatory" or something of that nature. For example, Magistrate Piester of this district has opined that:

> The question, of course, is whether, in the circumstances of this case, the lawyers "ought to be called" to testify on behalf of their client. This phrase has been strictly construed by those courts which have interpreted it. Cf. *Cossette v. Country Style Donuts, Inc.*, 647 F.2d 526 (5th Cir.1981) (plaintiff failed to show that it was "obligatory" to testify in order to advance the client's case "completely and zealously", at 530–531); *Davis v. Stamler*, 494 F.Supp. 339, 342, aff'd. 650 F.2d 477 (3rd Cir.1981) (attorney must have "crucial information," and is not indispensable if other witnesses are available to testify to the same information). See also *J.P. Foley and Co., Inc. v. Vanderbilt*, 523 F.2d 1357, 1358–1359 (2nd Cir.1975).

*Temple v. Reese*, 109 F.R.D. 1, 3 (D.Neb. 1985).

■ For operative purposes, therefore, I shall construe the phrase "ought to be called" as suggesting that the advocate who might be a potential witness must have crucial information before he or she "ought" to be called for purposes of the present motion.[1]

Although the defendants' brief is not specific, I perceive at least three situations where it might be argued that Qualley "ought" to be called as a witness on behalf of his clients if that decision were to be made by independent counsel objectively viewing the facts. I shall discuss each situation in turn.

The first situation has to do with Qualley's representation of some of the investors before the Internal Revenue Service. Obviously, the investors, and Qualley, took a position before the IRS different from the position Qualley and his clients now assert; that is, before the IRS Qualley and his clients advocated the legitimacy of the investments whereas now Qualley and his clients urge the illegitimacy of the programs. Understanding that this point is only significant from the perspective of the statute-of-limitations defense asserted by the defendants, I believe this apparent inconsistency is not significant enough for the court to conclude that Qualley "ought" to be called as a witness by his clients. It is apparent from the protest letters submitted to the IRS that Qualley's associates who drafted the letters assumed as a matter of fact the legitimacy of the investments. Indeed, Qualley's firm explicitly so stated when it submitted the protest letters to the IRS. Qualley's clients are fully capable of testifying that at the time they protested the IRS's decision to impugn the investments they had no objective reason to question the legitimacy of the investments. Indeed, at one point Mr. Bachman told the Krals that the general rule required that investors litigate with the IRS first (Defendants' Exhibit 3, letter of May 30, 1985, "the general rule regarding a security fraud case involving a tax shelter is that you must litigate the shelter with the IRS to prove that it was improper."). The defendants point out nothing which Qualley knew that his clients did not also know which would suggest that Qualley's testimony as to the positions asserted by the investors before the IRS was such as to require explanation only by Qualley.

---

1. I am aware of Ethical Consideration 5–10 which states in part that "where the question arises, doubts should be resolved in favor of the lawyer testifying and against his becoming or continuing as an advocate." As I understand it, this caveat is meant to inform counsel's decision. In the present circumstance, where counsel evidently has made his decision and the court is confronted with the question of whether counsel "ought" to testify, a more strict standard is appropriate in order to avoid the real threat that opposing counsel's motion to disqualify will be used as a tactical measure only.

The next area for which the defendants might reasonably argue that Qualley's testimony is crucial has to do with the seminar of March 10, 1984. At that seminar Eugene Weiss, the appraiser, spoke. It is clear that Weiss's statements at that meeting are especially significant to the plaintiffs. It is a fair summary of Weiss's testimony to suggest that he vouched for the validity of the appraisals which were so important in supporting the investments before the IRS. Since Qualley attended this seminar and even spoke at the meeting, it might be argued that as a witness to Weiss's statements Qualley is crucial to proving the existence of the statements. However, the facts suggest otherwise. Initially, it is observed that the meeting was attended by various investors, and there is no reason to believe that those investors could not competently recount the meeting. Moreover, and quite significantly, the meeting was videotaped (Defendants' Exhibit 4). Accordingly, there is a verbatim visual record of what occurred at the meeting and, therefore, the plaintiffs should have very little difficulty in establishing quite objectively what was said by the appraiser at the meeting. As a consequence, at least on the record before me, I do not understand why Qualley's testimony would be "crucial" to describing what happened at that meeting.

The third area of concern has to do with Bachman's initiating litigation in 1985 and Qualley's later discovery that Eugene Weiss would not support the appraisals as Qualley took Weiss's deposition in preparation for the *Clark* tax trial.

In this case there is a substantial question as to whether the two-year statute of limitations for professional negligence as set forth in Neb.Rev.Stat. § 25–222 (Reissue 1985) applies. That statute provides that any action to recover damages based upon alleged professional negligence or upon alleged breach of warranty in the rendition or failure to render professional services must be commenced within two years next after the alleged act or omission, provided that if the cause of action is not discovered and could not be reasonably discovered within such two-year period of time, then the action may be commenced within one year from the date of such discovery or from the date of discovery of facts which would reasonably lead to such discovery, whichever is earlier. There is a reasonable chance that this statute of limitations will be applied to at least two theories of recovery asserted by the plaintiffs, to wit, the negligent misrepresentation theory of recovery and the negligence theory of recovery.[2] If the two-year statute of limitations applies to at least two causes of action, one of the things that plaintiffs will be, or at least should be, extremely interested in explaining is why it was that Qualley was not "tipped off" when he learned or should have learned that Bachman had filed suit in 1985.

The first of Bachman's suits was filed May 7, 1985. *Kelly, et al. v. Rosenbaum, et al.*, CV85-0-492 (D.Neb.) (date complaint filed May 7, 1985). The first of the suits commenced by Qualley was filed August 11, 1987. *Nolte, et al. v. IFC Leasing Corp., et al.*, CV87-0-578 (D.Neb.) (date complaint filed August 11, 1987). By June 25, 1985, Bachman had explicitly told Charles and Susan Kral that a two-year statute of limitations might be applicable, at least to part of the causes of action

**2.** Neither plaintiffs' counsel nor moving defendants' counsel does a very good job in their briefs of discussing with any degree of clarity the issue of disqualification in light of the applicable statute of limitations. For purposes of this motion only, I have assumed that, except for the negligent misrepresentation and negligence theories of recovery, either the four-year statute of limitations in Nebraska found in Neb. Rev.Stat. § 25–207 (Reissue 1985) applies or, as to the RICO theory of recovery, that the four-year statute of limitations found in the Clayton Act applies pursuant to *Agency Holding Corp. v.*

*Malley–Duff & Associates, Inc.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). I have further assumed that the last actionable conduct on the part of the defendants took place at the March 10, 1984, meeting when Weiss made his representations regarding the appraisals. I have therefore assumed that the four-year statute of limitations would be applied from that date forward, as suggested by counsel for the plaintiffs. Memorandum of Law in Opposition to Defendants' Motion to Disqualify and in Support of Motion for Sanctions, at 3.

which Bachman had asserted, and he specifically asked the Krals to consider the impact of their withdrawal from the lawsuit that he had commenced on their behalf (Defendants' Exhibit 3, June 25, 1985). In their depositions the Krals testified that upon receipt of the June 25, 1985, letter they considered the possibility of filing suit against the promoters and consulted Qualley (Defendants' Exhibit 10, TR 250:6–25; 251:1). Thus, more than two years before the filing of the first lawsuit by Mr. Qualley there is evidence in the record that he had been informed that another lawyer in the same jurisdiction had filed lawsuits against the attorney defendants. I further note that Bachman has been endorsed as a witness by the attorney defendants in this case. It is quite likely that Bachman will testify, or at least give the impression, that at the very least Qualley should have discovered the problems about whether the notes were recourse or nonrecourse notes by the time Bachman commenced his first lawsuits in May, 1985.

As a consequence of the foregoing, I am persuaded that the plaintiffs, when viewing the facts objectively, "ought" to call Qualley as a witness to explain why it was that he disregarded the Bachman lawsuits, assuming that the two-year statute of limitations will be a matter at issue regarding at least two of the causes of action. The evidence is undisputed, at least at this point in time, that the plaintiffs will, to a person, testify that they relied on Qualley to determine whether or not it was appropriate to commence suit against the promoters as opposed to pursuing the tax litigation. I am, therefore, of the opinion that Qualley "ought" to be called as a witness regarding at least two of the asserted theories of recovery, presuming the court were to find those theories of recovery governed by the Nebraska two-year statute of limitations.

But having determined that Qualley "ought" to be called as a witness, I do not believe this finding ends the matter. I believe that if the plaintiffs knowingly waive their right to have Qualley testify on their behalf, then, under the peculiar circumstances of this case, the disqualification of Qualley may be avoided.

Although at least one court has suggested that a client cannot waive his/her right to call counsel as a witness when the court finds that such counsel "ought" to be called as a witness, *McArthur v. Bank of New York*, supra, 524 F.Supp. at 1209, I find little support for that "ostensible paternalism." *Id.* As Judge Gurfein stated in his concurrence in *J.P. Foley & Co., Inc. v. Vanderbilt*, supra, 523 F.2d at 1360, literal application of ethical principles can work to overcome justice:

Having made my own reservations explicit, I would also direct the District Court to give the Foleys, after affording them full information about the problem, a chance to express their own preference. That expression will, of course, not be binding on the court, but if courts are to take action that may adversely affect the client, the client should have a chance to express himself. After all, in cases that do not involve past representation, the attempt by an opposing party to disqualify the other side's lawyer must be viewed as a part of the tactics of an adversary proceeding. As such it demands judicial scrutiny to prevent literalism from possibly overcoming substantial justice to the parties. I express no views on the ultimate decision to be rendered by the District Court.

*Id.* at 1360.

The approach suggested by Judge Gurfein was the topic of a thoughtful law review article which suggests that the literal application of the witness-advocate rule is simply unfair and too costly to clients. Note, *The Advocate–Witness Rule: If Z, then X. But why?* 52 N.Y.U.L.Rev. 1365, 1397–1400 (1977). As pointed out in the note, the financial imposition on a client whose counsel is disqualified can be overwhelming, particularly when disqualification occurs on the eve of trial. *Id.* at 1397. Since the disqualified attorney is still entitled to be paid for his work, the client will have to hire new counsel to duplicate much of the disqualified counsel's efforts. *Id.* at 1398. Secondly, the costs of losing counsel familiar with the facts of the case and the history of the relationship between the par-

ties may put the client at a tactical disadvantage. *Id.* If the disqualification comes after discovery and shortly before trial, the pressure on the client to settle may be too great to withstand. *Id.* Finally, and importantly, in most cases the advocate has maintained an ongoing and close relationship with his client and the client's confidence and trust in his chosen counsel is an interest worthy of protection. *Id.*

■ Thus, it seems to me that if a client makes a knowing decision that he/she will not call counsel as a witness, there is no strong reason to substitute the court's judgment for that of the client provided that: (a) the costs of withdrawal to the client are high, thus suggesting a reasonable basis for the client's decision; and (b) the client's decision otherwise appears to be predicated on informed consent. See *Greenbaum–Mountain Mortg. Co. v. Pioneer Nat. Title Ins. Co.*, 421 F.Supp. 1348, 1354 (D.Colo.1976) (the informed consent of the client was accepted, where the client wished the law firm to remain as trial counsel, even though one of its members might be called as a witness).

■ In this case the motion to disqualify came at the pretrial conference after all discovery had been completed. The cost of disqualifying counsel at this late stage would be extremely high to the plaintiffs. This would undoubtedly place significant, if not overwhelming, pressure upon plaintiffs to endeavor to settle with the attorney defendants.[3] Furthermore, after nearly seven years of representing the investors,

both before the IRS and in this litigation, Qualley has developed what appears to be a very close working relationship with his clients which is nearly unique.[4] In this case the significance of Qualley's testimony on behalf of the plaintiffs has to do with the two-year statute of limitations which likely pertains, if at all, to only two of the theories of recovery. As to the fraud-based or RICO-based theories of recovery, it seems quite likely that the four-year statute of limitations will apply and Qualley's testimony in regard thereto would not, as I understand it from the briefs of the parties at this point, be especially significant or critical. Thus, the plaintiffs may very well choose rationally to forego two of the five theories of recovery in order to continue to employ counsel of their own choosing, particularly given the amount of time Qualley has already spent in the instant matter. Therefore, I think it appropriate to give Qualley's clients an opportunity to make the choice as to whether they wish to take the risk of Qualley's not testifying on their behalf. Accordingly, I shall seek to provide a mechanism for establishing that Qualley's clients consent to his not testifying on an informed basis. If the record then reflects that plaintiffs consent to Qualley's decision not to testify, no further consideration need be given to this aspect of the motion to disqualify.[5]

## 2. DR 5–102(B)

■ Although not extensively argued in their brief, there is a suggestion by the

---

**3.** It is noteworthy that in this case the motion to disqualify was made *after* a settlement conference produced settlement with respect to some, but not all, plaintiffs.

**4.** DR 5–101(B)(4) provides that a lawyer may accept employment in contemplated or pending litigation even where it is obvious that the lawyer ought to be called as a witness when refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

**5.** I note that this is not a situation where the court has forced Qualley's clients to decide that Qualley will not testify as a witness on their behalf. Qualley has already done so in the pretrial conference order. A substantially different question would be presented if Qualley

asserted that he should testify on behalf of his clients and be permitted to remain as counsel also. As a general matter, I agree with the courts which hold that a lawyer should not be permitted to be both a witness and an advocate in the same case simply because it is more cost effective for the client to have his lawyer appear as counsel and as a witness. If the expense and delay routinely incident to disqualification satisfied the substantial-hardship exception found in DR 5–101(B)(4), "that exception would soon swallow the rule" that a lawyer should not appear in the same case as a witness and an advocate by choice. *McArthur v. Bank of New York*, supra, 524 F.Supp. at 1210. In this case Qualley has recognized this point and elected not to testify on behalf of plaintiffs.

attorney defendants that since Qualley may be called as a witness by the attorney defendants, he should be disqualified under the provisions of DR 5–102(B). Under the circumstances of this case, I disagree.

DR 5–102(B) attempts to address those situations where a lawyer is called by an opponent to testify in a case in which that lawyer is also counsel of record for an adverse party. The rule provides that counsel may continue to appear as counsel in the case, notwithstanding the fact that he/she may also be a witness, "until it is apparent that his testimony is or may be prejudicial to his client." DR 5–102(B). Attorney defendants are evidently serious about calling Qualley as a witness, so the inquiry must focus upon whether or not Qualley's testimony will be prejudicial to his clients.

The argument advanced by attorney defendants respecting disqualification of Qualley under DR 5–102(A) contradicts the implicit assertion by attorney defendants that Qualley's testimony will be prejudicial to his clients. The phrase "ought to be called as a witness on behalf of his client" found in DR 5–102(A) implies that Qualley's testimony would be helpful to his clients' cause; as a consequence, I do not understand why attorney defendants claim that if they call Qualley as a witness his testimony will be prejudicial to his clients. In any event, I have closely examined the record made before me at the evidentiary hearing and I do not find that Qualley's testimony, if elicited by attorney defendants, will likely be prejudicial to his clients.

▪ I start the analysis with the realization that, "[a] finding of prejudice to the client under DR 5–102(B) is more stringent than under DR 5–102(A) since a litigant obviously may call his or her opponent's lawyer as [a] trial tactic to seek to disqualify the lawyer from the case." *Jones v. City of Chicago,* 610 F.Supp. 350, 360 n. 3 (N.D.Ill.1984), (citing *Freeman v. Kulicke & Soffa Industries, Inc.,* 449 F.Supp. 974 (E.D.Pa.1978), aff'd, 591 F.2d 1334 (3rd Cir. 1979). Obviously, the attorney defendants have the burden of proving prejudice.

*Freeman,* 449 F.Supp. at 978–79. The test for determining the existence of prejudice has been well stated to mean that the advocate-witness's testimony will be adverse to his client sufficient that his client will have an interest in discrediting his own lawyer's testimony:

> We think the policy underlying the disciplinary rule [DR 5–102(B)] gives rise to the test of what is "prejudicial": the projected testimony of a lawyer or firm member must be sufficiently adverse to the factual assertions or account of events offered on behalf of the client, such that the bar or the client might have an interest in the lawyer's independence in discrediting that testimony.

*Freeman,* 449 F.Supp. at 977.

Thus, the question is whether a lawyer associated with Qualley and representing Qualley's clients would, when confronted with his testimony, consider that testimony sufficiently adverse that trial counsel might need to impeach the credibility of Qualley but at the same time be inhibited from attacking Qualley's credibility because trial counsel was an associate of Qualley's. *Id.* at 977.

The attorney defendants do not explain in any detail how Qualley's testimony will be prejudicial. Presumably the attorney defendants will be seeking the mental impressions of Qualley in an effort to establish that he had no good reason for withholding the filing of suit, particularly after the Krals notified Qualley of the existence of the Bachman litigation. In all probability Qualley's mental impressions could not be elicited from him as a witness because of the familiar work-product doctrine. *In Re Murphy,* 560 F.2d 326, 336 (8th Cir. 1977) (mental impressions of a lawyer regarding the facts enjoy nearly absolute immunity). Therefore, unless Qualley were to waive the attorney-work-product claim, I doubt whether he could be compelled to answer questions about his reasons for withholding the filing of suit against the attorney defendants.

Assuming that Qualley would want to waive the attorney-work-product claim, I am not satisfied that his testimony would

be prejudicial to his clients. Attorney defendants have not suggested anything which Qualley should have been aware of prior to initiation of the Bachman suits which would have raised any question in Qualley's mind as to the validity of the investments and, particularly, the validity of the appraisals. Indeed, I have watched the video tape of Eugene Weiss, the appraiser, and, given Weiss's assurances, I can understand why Qualley might have been satisfied that the appraisals were independently and competently done.

Moreover, I am not convinced that Qualley would not be able to reasonably explain why he deferred filing suit against the attorney investors once he became aware of the Bachman suits. Bachman himself indicated that the "general rule" was to pursue the litigation with the IRS before suing promoters. In addition, Bachman's concern about the statute of limitations had to do with a statute of limitations peculiar to a state law securities claim (Defendants' Exhibit 3, letter of June 25, 1985). In that same letter Bachman acknowledged that the fraud causes of action would "not begin to run until discovery" (Defendants' Exhibit 3, letter of June 25, 1985). The first time Bachman ever presented the Krals with any specific information about fraud was in a letter dated September 9, 1986, when he noted that Stan Pearson had pled guilty to fraud pertaining to the original purchase of the master recordings (Defendants' Exhibit 3, letter of September 9, 1986). As a consequence, it seems to me that, at least on the record before me, Qualley can reasonably explain his failure to file suit when apprised of Bachman's litigation because: (a) as to the statute of limitations Bachman was concerned about, Qualley evidently did not plan to file a state law securities claim; and (b) it was not until September 9, 1986, that Bachman gave anyone associated with Qualley specific information about fraud and Bachman acknowledged that the fraud causes of action might not accrue until discovery.

Consequently, I am unable to ascertain from the record presented to me what it is that Qualley may testify about which will be "prejudicial" to his clients sufficient that his associates would be torn between attacking his credibility on the one hand and treating their colleague gently on the other hand.[6]

The attorney defendants rely principally upon the case of Jones v. Kovacs, 659 F.Supp. 835 (S.D.Tex.1987). In that case the court held that defendants, who intended to call plaintiff's counsel as an impeachment witness, were entitled to the disqualification of plaintiff's counsel under the so-called advocate-witness rule. Plaintiff's counsel in Jones sought to recover on behalf of plaintiff damages related to the taxes, interest and penalty the IRS had levied on the plaintiff arising out of a denial of a deduction plaintiff claimed for investments advised by defendant. In that case plaintiff's counsel had executed "protest letters" to the IRS wherein plaintiff's counsel made factual assertions under "penalty of perjury" as to the propriety of the credits and deductions concerning investments. The court said that "[plaintiff's counsel's] testimony would be adverse to the factual assertions he intends to offer on behalf of his client, and therefore his testimony would be prejudicial." Jones, 659 F.Supp. at 839 (citations omitted).

Jones is distinguishable from the instant case for two important reasons. First, in the Jones case counsel made factual assertions to the IRS under penalty of perjury. In this case Qualley's associates and partners did not make factual assertions under penalty of perjury; rather, they explicitly informed the IRS that they had made no investigation of the facts: "[counsel] do not personally know that the statements of fact contained in the protest and accompanying documents are true and correct." (Defendants' Exhibit 16 at 15). Moreover, in this case there is evidence in existence

6. Indeed, Qualley's deposition suggests that counsel for the attorney defendants was uncomfortable with Qualley's offering an opinion as to when he recognized the existence of his clients' causes of action. In that deposition counsel for the attorney defendants objected to Qualley's giving such opinion (Defendants' Exhibit 5, TR Vol. II at 49:2–11; 91:15–25; 92:1–22).

by virtue of the video tape of Eugene Weiss's statements that the promoters may have intentionally tried to deceive the investors and Qualley, not only about the investments per se but also about the dispute concerning the deductibility of the investments with the IRS. In other words, in this case Qualley asserts that it was part of the fraud to cover up the lack of deductibility before the IRS and, thus, if Qualley does testify, his testimony will not be contradictory but will be consistent with the assertion of the plaintiffs in this case. As a consequence, I conclude that *Jones* is not persuasive authority because of the factual differences between *Jones* and this case.

Under the circumstances presented in this case, I conclude that Qualley should not be disqualified because he may be called as a witness by the attorney defendants.[7]

### 3. Informed Consent

As noted earlier, I have a concern about whether Qualley "ought" to be called as a witness on behalf of plaintiffs. Moreover, since Qualley will be called as a witness for defendants, his clients may have an additional reason for wanting Qualley to testify on behalf of plaintiffs since Qualley will be called as a witness in any event. In order to address this concern, I believe Qualley's clients should be specifically advised of the possible dangers involved. Note, *The Advocate–Witness Rule: If Z, then X. But why?* 52 N.Y.U.L.Rev. at 1397–1400. Accordingly, by January 3, 1991, each of Qualley's clients (if they desire Qualley to continue representing them) shall execute and cause to be filed in the court's file an affidavit stating (if it is true) the following:

(1) the client has read and examined a copy of this memorandum and order;

(2) the client has been advised by Qualley that if requested to do so, he and his firm will withdraw as counsel;

(3) the client acknowledges that Qualley has informed him/her that the final determination of any issue involving the function of an attorney-witness is ultimately a decision for the client;

(4) the client acknowledges that he/she has discussed with Qualley the importance of and the necessity for the proposed testimony;

(5) the client acknowledges that he/she recognizes the possible detrimental impact of Qualley's not testifying on the client's behalf;

(6) the client acknowledges that Qualley has informed him/her that Qualley may be called as a witness on behalf of the attorney defendants and that he/she has discussed with Qualley the importance and possible detrimental impact of such testimony;

(7) the client acknowledges that he/she recognizes the possible detrimental impact of Qualley's being called as a witness on behalf of the attorney defendants;

(8) the client acknowledges that he/she recognizes the possible detrimental impact of Qualley's being called as witness on both Qualley's testimony and his advocacy as perceived by the jury;

(9) the client understands that he/she has an absolute right to independent counsel who would not appear or who would not need to appear as a witness in the pending litigation; and

(10) the client wishes Qualley and his firm to remain as trial counsel.

By January 3, 1991, Qualley shall file an affidavit in the court file stating (if it is true) the following:

---

7. At oral argument counsel for attorney defendants contended that if called as a witness, but permitted to act as trial counsel, Qualley might have difficulty arguing his own credibility in summation. I believe there are various measures available to the trial judge, such as cautionary jury instructions and supervision of cross-examination and closing arguments, which can be employed to safeguard against prejudice to either side. Note, *The Advocate–Witness Rule: If Z, then X. But why?* 52 N.Y.U.

L.Rev. at 1399. (Obviously Qualley should plan on having an associate present with him during trial.) However, the fact that Qualley is placed in a difficult position by attorney defendants when they propose to call him as a witness is not alone sufficient prejudice to require disqualification. If this were the case, simply calling the other side's lawyer as a witness would be enough to require disqualification. DR 5–102(B) does not stand for such a proposition.

(1) he has specifically advised and discussed with each and every client this memorandum and order and provided each and every client with a copy of this memorandum and order;

(2) he affirmatively represents that he has advised each and every client:

(a) that he and his law firm will withdraw if and when the client should wish that to occur;

(b) that the final determination of any issue involving the function of an attorney-witness is a decision for the client to make;

(c) of the significance, importance and necessity of his testimony, either on behalf of the plaintiffs or as a witness for the attorney defendants, and has endeavored to objectively explain the risks;

(d) that he/she has an absolute right to independent counsel who would not appear as a witness on behalf of either plaintiffs or attorney defendants;

(f) of the possible detrimental impact of his not testifying on behalf of the plaintiffs; and

(g) of the possible detrimental impact of his testimony should he be called as a witness on behalf of the attorney defendants, including the impact on a jury.

(3) Qualley shall state that (a) each and every client continues to wish him and his firm to appear as trial counsel in the pending cases notwithstanding the fact that Qualley will not be called as a witness on behalf of plaintiffs, but may be called as a witness on behalf of attorney defendants and (b) he is of the professional opinion that the decision of each and every client is voluntary, knowing and intelligent after full and complete disclosure of all relevant facts and risks.

If the foregoing affidavits are filed within the time provided, the case shall proceed to trial. If the foregoing affidavits are not filed within the time provided, the attorney defendants may renew their motion to disqualify Qualley.

### B. *Motion For Sanctions*

Plaintiffs move for sanctions. Their motion is predicated upon the provisions of 28 U.S.C. § 1927. Applying the objective standards set forth in Fed.R.Civ.P. 11, the motion for sanctions will be denied.

IT IS ORDERED that:

(1) the motion to disqualify (Filing 274) is denied, without prejudice;

(2) the motion for sanctions (Filing 275) is denied;

(3) attorney Qualley and the plaintiffs shall file the required affidavits as set forth in this memorandum and order on or before January 3, 1991, and should the affidavits which are filed be deficient or not filed within the time provided, the attorney defendants may renew their motion for disqualification by filing a new motion.

